IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

---

JESSYKA MURRAY, AN INCAPACITATED PERSON, THROUGH HER
GUARDIANS AND PARENTS, ROBERT MURRAY AND MARCIA MURRAY,
FORMERLY HUSBAND AND WIFE; AND ROBERT MURRAY AND MARCIA
MURRAY, FORMERLY HUSBAND AND WIFE,
*Plaintiffs/Appellants/Cross-Appellees,*

*v.*

FARMERS INSURANCE COMPANY OF ARIZONA; FOREMOST INSURANCE
COMPANY GRAND RAPIDS, MICHIGAN; RANDY JONES INSURANCE
AGENCY, INC., AN ARIZONA CORPORATION; AND RANDY JONES AND
DEANNA JONES, HUSBAND AND WIFE,
*Defendants/Appellees/Cross-Appellants.*

No. 2 CA-CV 2014-0123
Filed January 19, 2016

---

Appeal from the Superior Court in Pima County
No. CV20124962
The Honorable Carmine Cornelio, Judge

**AFFIRMED IN PART; REVERSED IN PART**

---

COUNSEL

Haralson, Miller, Pitt, Feldman & McAnally, P.L.C., Tucson
By Stanley G. Feldman and Thomas G. Cotter
*Counsel for Plaintiffs/Appellants/Cross-Appellees*

Lewis Brisbois Bisgaard & Smith, LLP, Phoenix
By Carl Mariano and Michael P. Obert, Jr.
*Counsel for Defendants/Appellees/Cross-Appellants*

and

Jeffry A. Miller, San Diego, California
*Pro Hac Vice*

---

**OPINION**

Judge Espinosa authored the opinion of the Court, in which Presiding Judge Miller and Chief Judge Eckerstrom concurred.

---

E S P I N O S A, Judge:

¶1        In this insurance agent malpractice action, appellants Jessyka Murray and her parents Robert and Marcia Murray (the Murrays) seek the reversal of the trial court's order granting a new trial on all issues and the remand of the matter for a new trial on damages only. They also petition this court to reverse certain partial summary judgments entered by the court and its ruling on their motion made pursuant to Rule 49(c), Ariz. R. Civ. P. The Murrays lastly request reversal of the trial court's interpretation of their umbrella policy. Appellees Randy Jones, the Randy Jones Insurance Agency, Farmers Insurance Company of Arizona (Farmers) and Foremost Insurance Company (Foremost) cross-appeal, contending Jones's compliance with the requirements of Arizona's Uninsured/Underinsured Motorist Act precludes the Murrays' claims. For the following reasons, we affirm in part and reverse in part.

**Factual and Procedural Background**

¶2        "We view the facts in the light most favorable to upholding the trial court's ruling." *Hammoudeh v. Jada*, 222 Ariz. 570, ¶ 2, 218 P.3d 1027, 1028 (App. 2009).  Jones and the Randy Jones Insurance Agency were authorized by Farmers to offer and sell insurance coverage to Jones's clients through Farmers.  For twenty years, Robert and Marcia [1] purchased their automobile and homeowners insurance from Jones.  Before he became their agent, the Murrays had purchased only minimum liability limits and matching minimum uninsured motorist (UM) and underinsured motorist (UIM) coverage.  With Jones as their agent, over the years the Murrays added a one-million-dollar personal umbrella, increased each auto policy's liability limits to 250/500K and added a Foremost insurance policy for their off-road vehicle with liability limits of 250/500K.[2]  Jones, however, did not recommend that they increase their UM/UIM coverage above the minimum limits of 30/60K for their auto policy or 25/50K for their off-road vehicle, or that they buy UM/UIM in limits corresponding to their liability coverage.

¶3        Robert and Marcia testified that when they discussed UM/UIM coverage with Jones, he advised them they did not need increased UM/UIM limits because their family had health insurance through Robert's employer.  Jones, however, denied telling the Murrays "that if they had health insurance they d[id]n't need to buy any UM/UIM or as much UM/UIM insurance."

¶4        In November 2010, Jessyka, then seventeen, was a passenger in a two-vehicle accident that involved both an uninsured

---

[1]For clarity and convenience, we will use the Murrays' first names when referring to them individually.

[2] Auto policy limits are expressed as two numbers, e.g., 250/500K.  The first number is the maximum amount the policy's coverage will pay per person in an accident and the second number is the maximum the policy will pay per accident.

motorist and an underinsured motorist. She sustained a traumatic brain injury that permanently incapacitated her, and Robert and Marcia were appointed her guardians.

¶5 In August 2012, Robert and Marcia, individually, and as guardians of Jessyka, filed a complaint against Jones, the Randy Jones Insurance Agency, Farmers, and Foremost alleging professional negligence, consumer fraud under A.R.S. § 44-1522 and insurance fraud under A.R.S. § 20-443. Farmers and Foremost were included as defendants based on vicarious liability for Jones.[3]

¶6 In July 2013, Jones moved for summary judgment on all claims, pointing out that the Murrays had signed UM/UIM Selection Forms for each of their policies and arguing their selection was "valid for all insureds" under A.R.S. § 20-259.01. The trial court denied Jones's motion, finding that his compliance with the statute did not insulate him from liability.

¶7 After a four-day trial, the jury returned a seven to one verdict of $180,000 in favor of the Murrays. Before the jury was discharged, the Murrays orally moved to have the jury deliberate further on grounds the verdict was non-responsive to the submitted issues, citing Rule 49(c), Ariz. R. Civ. P. After briefing and argument, the trial court concluded that Rule 49(c) did not apply, accepted the verdict and discharged the jury.

¶8 The Murrays later filed a motion for additur or new trial on damages that the trial court denied. It ultimately, however, vacated the judgment and ordered a new trial on all issues. The Murrays appealed and Jones cross-appealed from the denial of his motion for summary judgment. This court has jurisdiction pursuant to A.R.S. §§ 12-120.21(A) and 12-2101(A)(1), (5)(a).

---

[3]For convenience, we will refer to appellees Jones, the Randy Jones Insurance Agency, Farmers and Foremost collectively as "Jones."

**Rule 49(c), Ariz. R. Civ. P.**

**¶9** The Murrays first argue the trial court abused its discretion by denying their motion filed pursuant to Rule 49(c). That rule provides that if a "verdict is not responsive to the issue submitted to the jury, the court shall call the jurors' attention thereto, and send them back for further deliberation." We review the application of court rules de novo. *Haroutunian*, 218 Ariz. 541, ¶ 22, 189 P.3d at 1122.

**¶10** A party who believes a jury verdict is inconsistent, defective, or nonresponsive, must move, before the jury is excused, for resubmission of the case to the jury pursuant to Rule 49(c). *See Trustmark Ins. Co. v. Bank One, Ariz., NA*, 202 Ariz. 535, ¶ 39, 48 P.3d 485, 493 (App. 2002). An objection based on Rule 49(c) provides an opportunity to correct error with "minimal effort and expense." *Id.* ¶ 40. A court will resubmit a case to the jury where its verdict is clearly inconsistent, defective, or nonresponsive. *See, e.g.*, *Gray v. Gardiner*, 92 Ariz. 208, 210, 375 P.2d 562, 563 (1962) ("patent inconsistency" where "impossible" to find issues in favor of either plaintiffs or defendant and not make award in some amount); *Fornara v. Wolpe*, 26 Ariz. 383, 389-91, 226 P. 203, 204-05 (1924) (defective verdict where recovery amount less than instructed); *Piper v. Bear Med. Sys., Inc.*, 180 Ariz. 170, 179, 883 P.2d 407, 416 (App. 1993) (verdict awarding punitive damages but zero compensatory damages rendered it unresponsive), *superseded by statute*, Uniform Contribution Among Tortfeasors Act, 1984 Ariz. Sess. Laws, ch. 237, *as recognized in Watts v. Medicis Pharm. Corp.*, 236 Ariz. 511, ¶¶ 31, 38, 41, 342 P.3d 847, 854-56 (App. 2015); *Farmers Ins. Co. v. Tallsalt*, 191 Ariz. 177, 180, 953 P.2d 921, 924 (App. 1997) (verdict nonresponsive where counterclaim not addressed), *vacated in part on other grounds*, 192 Ariz. 129, 962 P.2d 203 (1998); *cf. Walsh v. Advanced Cardiac Specialists Chartered*, 229 Ariz. 193, ¶ 14, n.1, 273 P.3d 645, 649, 650 n.1 (2012) (verdict neither defective nor unresponsive where award of zero damages was not impermissible as matter of law).

**¶11** Here, the trial court had instructed the jury that if it found Jones was at fault, it "must then determine how much additional UM/UIM coverage the Murrays would have purchased

up to $1,890,000."[4]  Evidence at trial showed that the Murrays had the option of purchasing UM/UIM coverage in limits of 50/100K, 100/300K or 250/500K.  The jury's verdict of $180,000, however, did not reflect any option available to the Murrays and, as they assert and Farmers does not contest, the verdict "cannot be mathematically reconciled with any UM/UIM limit that [they] could have bought under the undisputed evidence."

**¶12**        After the Murrays requested that the jury deliberate further pursuant to Rule 49(c), the trial court noted that the parties had agreed to "le[ave] the verdict form open" as to the amount of additional UM/UIM coverage that might have been purchased.  It posed the question of how it would instruct the jury post-verdict, noting the difficulty of resubmitting the instruction without telling the jury, in essence, "pay attention to the evidence and redecide the case."[5]  The court concluded that a verdict could be "flawed" but

---

[4] This is the maximum amount of UM/UIM benefits the Murrays could have purchased under their Farmers' policies:

|  | UM Claimed | UIM Claimed | Total  Claimed |
|---|---|---|---|
| **Farmers** | $250,000 | $250,000 | $500,000 |
| **Foremost** | $250,000 | $250,000 | $500,000 |
| **Farmers Umbrella** | $1,000,000 combined | | $1,000,000 |
| **Total Claimed** | | | $2,000,000 |
| **Total Received** | | | ($110,000) |
| **Potential Damages** | | | 1,890,000 |

[5] The Murrays requested the court reinstruct the jury by directing them to find for the defendants or for the Murrays "in the amount of [$]890[,000] or [$]1,890,000," amounts that would

responsive, and was in this case.  It further noted that it "c[ould]n't imagine . . . an instruction that wouldn't, to some degree or another, comment on the evidence and direct [the jury's] decision."  Finally, it agreed with Jones that Rule 49(c) involved "more of a . . . failure to follow the legal issues in the case than the evidentiary decision making."

**¶13**        The jury's verdict was within the instructed range, the error was not one of law, and we agree with the trial court's assessment that any attempt to direct the jury to correct its verdict to conform to the available policy limits would have constituted a comment on the evidence.  We therefore cannot say the court erred by refusing to require the jury to further deliberate pursuant to Rule 49(c).  *See Walsh*, 229 Ariz. 193, ¶ 14, n.1, 273 P.3d at 649, 650 n.1; *see also* Ariz. Const. art. VI, § 27 ("Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law.").

## Order for New Trial on All Issues

**¶14**        The Murrays next contend the trial court abused its discretion when, after denying their motion for a new trial on damages, it ordered a new trial on all issues, rather than only damages.  The court ordered the new trial after finding:

> (1)     The jury's verdict is likely a result of sympathy, and/or prejudice, and/or a compromised verdict between liability and damages.
>
> (2)     The damages number was not supported by reasonable evidence that was submitted.

---

correspond to the evidence and argument presented at trial.  Jones responded that if the court told the jury "you have to go back and reach a verdict that's based on one of these numbers, it's purely a comment on the evidence."

(3)    This Court does not believe that granting a new trial, simply on the damages with liability already established, will present the next jury with a case in which the issues can be fully understood, because they are, in this Court's opinion, inextricably interwoven.

**¶15**        "The trial court's right to order a new trial . . . is completely discretionary."  *Martinez v. Schneider Enters., Inc.*, 178 Ariz. 346, 349, 873 P.2d 684, 687 (App. 1994).  The decision to grant a new trial on all issues is likewise discretionary and routinely upheld. *See Englert v. Carondelet Health Network*, 199 Ariz. 21, ¶ 18, 13 P.3d 763, 770 (App. 2000) (noting absence of Arizona cases holding trial court had abused discretion by ordering new trial on all issues). "We review an order granting a new trial under a more liberal standard than an order denying one, and we will not overturn the order absent a clear abuse of discretion."  *State Farm Fire & Cas. Co. v. Brown*, 183 Ariz. 518, 521, 905 P.2d 527, 530 (App. 1995); *see also Englert*, 199 Ariz. 21, ¶ 14, 13 P.3d at 769 (abuse of discretion is "'discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons'"), *quoting Torres v. N. Am. Van Lines, Inc.*, 135 Ariz. 35, 40, 658 P.2d 835, 840 (App. 1982).

**¶16**        The Murrays do not contest the trial court's grant of a new trial, but contend it should be limited to damages only. Pursuant to Rule 59(h), Ariz. R. Civ. P.:

A new trial, if granted, shall be only a new trial of the question or questions with respect to which the verdict or decision is found erroneous, if separable.  If a new trial is ordered because the damages are excessive or inadequate and granted solely for that reason, the verdict shall be set aside only in respect of the damages, and shall stand in all other respects.

But, "[p]artial new trials are not recommended because they create much opportunity for confusion and injustice." *Styles v. Ceranski*, 185 Ariz. 448, 451, 916 P.2d 1164, 1167 (App. 1996). "A partial trial should be granted when the issues are not inextricably intertwined and can be separated without prejudice to the parties." *Englert*, 199 Ariz. 21, ¶ 15, 13 P.3d at 769; *see also Tovrea Equip. Co. v. Gobby*, 72 Ariz. 38, 43, 230 P.2d 512, 516 (1951) ("'It is only when the reason for setting aside the verdict relates solely to damages disassociated from every other contributing, related or vitiating cause that the new trial shall be limited to the question of the amount of damages alone.'"), *quoting S. Pac. Co. v. Gastelum*, 36 Ariz. 106, 126, 283 P. 719, 726 (1929). The court should resolve any doubt in favor of a new trial on all issues. *Styles*, 185 Ariz. at 451, 916 P.2d at 1167.

**Compromise Verdict**

¶17        As its findings made clear, the trial court determined the jury's verdict on damages had been affected by the jury's findings on liability. The court found, first, that the verdict was a compromise verdict, that is, a verdict in which "some of the jurors have conceded liability against their judgment, and some have reduced their estimate of the damages in order to secure an agreement of liability with their fellow jurors[.]'" *State v. Watson*, 7 Ariz. App. 81, 88, 436 P.2d 175, 182 (1967), *quoting Gastelum*, 36 Ariz. at 125, 283 P. at 725. In such cases, a new trial confined to the single issue of damages would be a serious injustice to the defendant; "[h]e has never had the issue of liability determined by the conscientious conviction of all of the jury [as] he is entitled to have." *Gastelum*, 36 Ariz. at 125, 283 P. at 725. Our supreme court has held that where liability was "vigorously contested" and the jury's verdict was "so inadequate as to constitute error," these facts permit the inference that "certain jurors believed there was no liability at all but consented to a smaller verdict than those jurors convinced of liability desired to return, in order that a verdict might

be reached[;] it follows that the issues of liability and the amount of damages are not separable." *Id.* at 124-25, 283 P. at 725.[6]

**¶18** Here, liability was contested and the verdict was approximately ten percent of the amount of damages sought by the Murrays, with no plausible rationale for the amount of the award.[7] *Cf. Saide v. Stanton,* 135 Ariz. 76, 80, 659 P.2d 35, 39 (1983) (new trial limited to damages where liability contested but verdict not disproportionate to proven damages, and court unable to say verdict represented compromise or result of passion and prejudice); *Tovrea Equip. Co.*, 72 Ariz. at 41-42, 230 P.2d at 514-15 (where verdict grossly in excess of damages established by evidence, jury likely either confused or motivated by prejudice and new trial must be on all issues). On these facts, we are unable to say the trial court erred in finding the jury rendered a compromise verdict. *See Saide*, 135 Ariz. at 80, 659 P.2d at 39.

---

[6]At oral argument, the Murrays questioned the relevance of *Gastelum*, pointing out it was decided before the Arizona Rules of Civil Procedure were promulgated in 1956. We note however that in *Gastelum*, our supreme court applied paragraph 597 of the 1913 Civil Code, whose pertinent language is nearly identical to Rule 59(h), quoted above. 36 Ariz. at 124-25, 283 P. at 725. We are therefore unconvinced by the Murrays' argument that *Gastelum* is outdated and lacks relevance following the promulgation of Rule 59(h).

[7]The Murrays point out that Rule 59(h) provides "[i]f a new trial is ordered because the damages are excessive or inadequate and granted solely for that reason, the verdict shall be set aside only in respect of the damages, and shall stand in all other respects." As our supreme court noted in *Gastelum*, however, this provision "does not authorize the court in the exercise of its discretion to grant a new trial of the issue of damages alone when it is clear that a retrial of that issue disassociated from that of liability will not be fair to the defendant." 36 Ariz. at 125, 283 P. at 725.

**Verdict as a Result of Sympathy or Prejudice**

¶19      The trial court alternatively found the verdict was a result of sympathy or prejudice. When the Murrays disputed that finding, the court stated:

> I disagree with you. I don't think your liability testimony was particularly strong. . . . The liability portion of the case while I have already acknowledged made a lot of common sense, from the "expert" point of view, it was not a strong liability case. . . . [The Murrays] are lovely people who are committed to their daughter, who have worked hard all their lives and didn't deserve to have this thing happen to them and are about as most sympathetic a set of plaintiffs as I have had in my courtroom in my 14 years. Usually, a sympathetic verdict is one that goes over the top and gives too much money[,] . . . it can also be one in which a reasonable jury could say . . . you were fully informed, you signed off on how many forms you signed off on, but sympathy says we should give you something.

The court concluded, "[s]o I am having a hard time explaining the verdict. Everybody [i]s. So I will give everybody the opportunity to go get a new verdict."

¶20      On appeal, the Murrays dispute the trial court's finding that the verdict was the result of passion and prejudice. They note that Jessyka was only allowed to be present at trial during voir dire and that the court excluded her medical records and expenses, pre-accident photographs, and evidence of her on-going therapy requirements. They also point out the parties had stipulated that Jessyka's accident-related damages exceeded the maximum UM/UIM coverage her parents could have purchased, two million

dollars,[8] and they had presented evidence, though limited, showing their health insurance was insufficient to meet Jessyka's post-accident needs.  And yet, as they note, the jury awarded them only $180,000.

**¶21**     The Murrays assert they "did nothing to evoke sympathy" and insist the new trial should be limited to damages, citing *Saide*, 135 Ariz. at 79, 659 P.2d at 38.  There, our supreme court ordered a new trial limited to the issue of damages, reasoning that "the verdict was not disproportionate to the proven damages, and we cannot say that the verdict represented a compromise or was the result of passion or prejudice."  *Id.* at 80, 659 P.2d at 39.  But the Murrays have identified no factual parallel between the jury's verdict in *Saide* and the verdict here.  And unlike in *Saide*, the trial court specifically found the verdict was "likely the result of sympathy, and/or prejudice," stating that the Murrays did not present a strong liability case "from the 'expert' point of view," but that they were "about [the] most sympathetic a set of plaintiffs as [it] ha[s] had in [its] courtroom in [its] 14 years."

**¶22**     As we have observed, the trial court is in the best position to evaluate the effect of the evidence on the jury. *See Englert*, 199 Ariz. 21, ¶ 18, 13 P.3d at 770; *cf. Cal X-Tra v. W.V.S.V. Holdings, L.L.C.*, 229 Ariz. 377, ¶ 92, 276 P.3d 11, 39 (App. 2012) (trial judge has "unique opportunity to hear the testimony and argument, observe its effect on the jury, and determine through his observations that the trial had been unfairly compromised; in contrast, we have only a cold record, which does not convey voice emphasis or inflection, or allow us to observe the jury and its reactions").  Given the trial court's stated observations and the jury's inexplicable verdict, we are unable to rule out a verdict based on sympathy.  Consequently, we cannot say the court abused its discretion by refusing to limit the new trial to the amount of

---

[8] As discussed later, the Murrays contend their maximum UM/UIM benefit under their policies was actually three million dollars.

damages.[9] *Cf. Gastelum*, 36 Ariz. at 125-26, 283 P. at 725-26; *see also Styles*, 185 Ariz. at 451, 916 P.2d at 1167; *Englert*, 199 Ariz. 21, ¶ 14, 13 P.3d at 770 (trial court abuses its discretion when "'discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons'"), *quoting Torres*, 135 Ariz. at 40, 658 P.2d at 840.

**¶23** The Murrays have cited as supplemental authority, *Tarron v. Bowen Mach. & Fabricating, Inc.*, 225 Ariz. 147, 235 P.3d 1030 (2010) and *State v. Fischer*, 238 Ariz. 309, 360 P.3d 105 (App. 2015), to support their contention that the trial court erred by refusing to limit the scope of the new trial to damages only. These cases, however, do not change our analysis. In *Tarron*, our supreme court remanded for a limited new trial, leaving the jury's award of damages to the plaintiff and certain fault allocations undisturbed. However, the posture of that case does not resemble the one before us—the fault allocations excluded from the new trial were not contested and, like the jury's award of damages, were unrelated to the issue to be resolved at the new trial.

**¶24** *Fischer*, in contrast, is a criminal case in which the state appealed the trial court's grant of the defendant's motion for new trial based on the weight of the evidence. 238 Ariz. 309, ¶¶ 1, 6, 360 P.3d at 107-08. This court pointed out "[a] judge may not set aside a verdict 'merely because, if he had acted as trier of fact, he would have reached a different result,' nor may he substitute his own judgment for that of the jury" and concluded the trial court had made factual findings not supported by the record and failed to

---

[9]While we acknowledge the Murrays' arguments regarding judicial economy and fairness—in that they were not responsible for necessitating the new trial—again, given the irrational verdict and the trial court's observations, we cannot simply assume, as the Murrays suggest, that the verdict was the result of the jury's misunderstanding the evidence or miscalculating the award. As noted above, any doubts as to whether prejudice would result from a limited trial should be resolved in favor of a new trial on all the issues. *See Styles*, 185 Ariz. at 451, 916 P.2d at 1167.

consider all the evidence in reaching its conclusions. *Id*. ¶¶ 19, 29, *quoting Cano v. Neill*, 12 Ariz. App. 562, 569, 473 P.2d 487, 493 (1970).

¶25 Neither *Tarron* nor *Fisher* address the situation here, where the trial court made a supported finding that the jury's verdict intertwined issues of liability and damages and the court consequently ordered a new trial on all issues. The court's ruling did not "exceed[ ] the bounds of reason" in any respect. *Englert*, 199 Ariz. 21, ¶ 14, 13 P.3d at 769 (we will affirm trial court's decision if it did not "'exceed[] the bounds of reason by performing the challenged act'"), *quoting Toy v. Katz*, 192 Ariz. 73, 83, 961 P.2d 1021, 1031 (App. 1997) (alteration in *Englert*).

## Summary Judgment Rulings

¶26 Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law." Ariz. R. Civ. P. 56(a). We review de novo a trial court's grant of summary judgment and view the evidence and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. *Felipe v. Theme Tech Corp.*, 235 Ariz. 520, ¶ 31, 334 P.3d 210, 218 (App. 2014).

### Emotional Distress Damages Claim

¶27 The Murrays contend the trial court erred in granting summary judgment on their claims for emotional distress damages. They assert that "Jones' conduct deprived [them] of UM/UIM benefits that would have allowed them to meet many of Jessyka's post-accident needs," including extending her hospitalization, increasing her number of therapies, allowing the family residence to be remodeled to better accommodate her needs, and providing her with a device to allow her to communicate.

¶28 In its ruling, the trial court "acknowledge[d] the real emotional distress of the plaintiffs in this case" but found "under current Arizona case law, [Jones's] negligence did not directly affect or burden a personal right or interest of [the Murrays]," citing *Kaufman v. Langhofer*, 223 Ariz. 249, 222 P.3d 272 (App. 2009). It

noted that the *Kaufman* court had reviewed Arizona case law on emotional distress damages and that such damages were allowed only where the tortious act directly harmed a plaintiff and burdened a personal, as opposed to an economic interest. The trial court further cited *Reed v. Mitchell & Timbanard, P.C.*, 183 Ariz. 313, 903 P.2d 621 (App. 1995), for the proposition that "consequential damages for emotional distress are not recoverable when the plaintiff's direct damages are pecuniary." The trial court concluded:

> Here, the direct damages from the Defendant's negligence is pecuniary (loss of larger UM/UIM insurance coverage). The case law is clear and this Court is bound to follow and apply that law in the ruling here.
>
> Plaintiffs claim that as a consequence of the loss of larger coverage, they have suffered emotional distress. No doubt this is true.
>
> It may also be true that the law is 'evolving' in the area of emotional damages. However, the law in Arizona has not (yet) evolved so as to allow emotional distress damages as a consequence of pecuniary damages.
>
> A trial court is bound by established and clear case law. While the facts of this case may support further evolution (and less restriction) on limits of emotional distress damages, this Court must apply *Reed* and *Kaufman* and Grant the Defendant's Motion for Partial Summary Judgment [on the Murrays'] emotional distress damages.

¶29 As the trial court correctly observed, in Arizona, "a party may recover damages for emotional distress arising out of the

15

tortious loss of property" where "the tortious act directly harmed the plaintiff and affected or burdened a personal, as opposed to an economic or other interest belonging to the plaintiff." *Kaufman*, 223 Ariz. 249, ¶ 15, 222 P.3d at 276. Examples of personal damages are the loss of liberty or damage to a family relationship. *Reed*, 183 Ariz. at 318–19, 903 P.2d at 626–27. In applying this principle, we have held that plaintiffs could seek emotional damages for the destruction of their fertilized human eggs, *see Jeter v. Mayo Clinic Ariz.*, 211 Ariz. 386, ¶¶ 73-75, 121 P.3d 1256, 1273 (App. 2005), and for suffering, as a tenant, the annoyance and discomfort of living in inadequate housing, *see Thomas v. Goudreault*, 163 Ariz. 159, 167, 786 P.2d 1010, 1018 (App. 1989).

¶**30**     In contrast, we have precluded the recovery of emotional distress damages where the plaintiff's interest was determined to be "purely economic." *Reed*, 183 Ariz. at 319, 903 P.2d at 627. There, in a legal malpractice action, the plaintiff alleged her attorneys had failed to adequately secure a promissory note given to her by her former husband in connection with their divorce, which put her financial security at risk and consequently caused her emotional distress. *Id.* at 315-16, 903 P.2d at 623-24. We held that "because the direct result of the alleged malpractice is purely economic, the exception allowing recovery for emotional distress when the interest affected is a personal one is not applicable." *Id.* at 319, 903 P.2d at 627. Likewise, we held that a pet owner could not recover emotional distress damages after the death of his pet due to a veterinarian's alleged malpractice because Arizona law classifies animals as personal property and the veterinarian's negligence "did not directly harm [the plaintiff] in that it did not affect or burden a personal right or interest belonging to him." *Kaufman*, 223 Ariz. 249, ¶¶ 10, 17, 19, 222 P.3d at 275-76.

¶**31**     The Murrays contend that the negligent failure to sell uninsured and underinsured coverage implicates the insured's well-being and is particularly likely to cause serious emotional harm. Albeit in another context, our supreme court has recognized that an insured's relationship with an insurer is not a strictly financial one. *See Taylor v. State Farm Mut. Auto. Ins. Co.*, 185 Ariz. 174, 176, 913

P.2d 1092, 1094 (1996). The court noted, "[t]he insured receives intangible benefits from the relationship, such as peace of mind." *Id.* And in *Rawlings v. Apodaca*, the court "recognize[d] that in buying insurance an insured usually does not seek to realize a commercial advantage but, instead, seeks protection and security from economic catastrophe." 151 Ariz. 149, 154, 726 P.2d 565, 570 (1986). The insured, the court concluded, "seeks peace of mind from the fears that accompany such exposure." *Id.* We accept therefore for our analysis that an insurer-insured relationship is not merely a financial one but includes an expectation of security and protection before and at the time of a catastrophe.

¶32 In their complaint, the Murrays stated they had "relied on and trusted Jones in determining what insurance coverage to obtain and what limits would provide them complete protection." Marcia Murray averred there were "many other examples where Jessyka, [Robert] and I have suffered mental distress because Jessyka did not have access to UM/UIM benefits that were equal to our auto liability limits, and as a result she has not been able to secure needed care, therapies and equipment." And at trial, after being asked what he had wanted when meeting with Jones about the Murrays' insurance coverage prior to the accident, Robert Murray responded that he had wanted coverage, noting: "I mean, I have a family that you have to take care of. That's my job. And so you want the best to cover your family." He also testified that after the accident he "ha[d] to go to the community to try and raise funds to provide some of the services that [he] couldn't pay for because [he] didn't have UM and UIM coverage."

¶33 As noted above, our review of the trial court's ruling is de novo and we view the evidence and all reasonable inferences in the light most favorable to the Murrays. *Felipe*, 235 Ariz. 520, ¶ 31, 334 P.3d at 218. From the evidence provided and reasonable inferences therefrom, a factfinder could conclude the Murrays suffered direct emotional distress from Jones's negligence that was non-economic, that is, the loss of their reasonable expectations and peace of mind that they and their children were insured against economic catastrophe. We therefore conclude this is the appropriate

case for the "evolution" of the law contemplated by the trial court. Accordingly, we reverse the court's ruling and remand this issue for further proceedings on the Murrays' emotional distress damages claims.

**Fraud Claims under A.R.S. §§ 20-443, 20-443.01, and 44-1522**

¶34 The Murrays next contend the trial court erred in granting summary judgment on Jessyka's claims under Arizona's Consumer Fraud Act (CFA), A.R.S. § 44-1522, and the insurance fraud statute, A.R.S. §§ 20-443 and 443.01, because "as a resident of the Murray household, Jessyka was both an insured and an express third-party beneficiary of the Murrays' motor vehicle and umbrella insurance policies."[10] At a pretrial hearing, the trial court determined that Jessyka lacked standing to bring a claim under the consumer fraud statute, stating:

> The Arizona statute requires that the act be with the intent that others rely and that there was, in fact, reliance. Whether it was reasonable or not, it still requires reliance.
>
> And Jessyka was not one who was made to, [sic] nor the person who the reliance was made on.

The court distinguished case law from other states cited by the Murrays where third-party beneficiaries were found to have standing to assert consumer fraud claims, noting differences between Arizona's consumer fraud statute and those of the other states,[11] and concluded that Jessyka could not bring her claim under the statute.

---

[10]Before trial, the Murrays conceded the statute of limitation had run on Robert and Marcia's statutory fraud claims.

[11] As the parties do not argue there is any appreciable difference between the insurance fraud statute and the consumer

¶35        Arizona's Consumer Fraud Act (CFA) provides:

>          The act, use or employment by any
> person of any deception, deceptive or
> unfair act or practice, fraud, false pretense,
> false promise, misrepresentation, or
> concealment, suppression or omission of
> any material fact with intent that others
> rely on such concealment, suppression or
> omission, in connection with the sale or
> advertisement of any merchandise whether
> or not any person has in fact been misled,
> deceived or damaged thereby, is declared
> to be an unlawful practice.

§ 44-1522(A). "The purpose of the [CFA] is to provide injured consumers with a remedy to counteract the disproportionate bargaining power often present in consumer transactions." *Waste Mfg. & Leasing Corp. v. Hambicki*, 183 Ariz. 84, 88, 900 P.2d 1220, 1224 (App. 1995). Our supreme court has recognized an implied private cause of action under the act. *See Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 576, 521 P.2d 1119, 1122 (1974).

¶36        "It is well-settled that a person or entity need not intend to deceive to violate the statute." *Powers v. Guar. RV, Inc.*, 229 Ariz. 555, ¶ 17, 278 P.3d 333, 338 (App. 2012). Nor does the statute require that the defendant know that the misrepresentations are false. *Id.* "To succeed on a claim of consumer fraud, a plaintiff must show a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and consequent and proximate injury resulting from the promise." *Kuehn v. Stanley*, 208 Ariz. 124, ¶ 16, 91 P.3d 346, 351 (App. 2004).

---

fraud statute in the current context and rely solely on case law involving the consumer fraud statute, we evaluate that statute exclusively.

¶37 Jones asserts that "a viable consumer fraud claim requires that the claimant be a party to the sale in which the misrepresentation took place." In support he cites *Sullivan v. Pulte Home Corp.*, 231 Ariz. 53, 290 P.3d 446 (App. 2012), which held that subsequent homeowners did not have a viable private cause of action under the CFA against the homebuilder "[b]ecause a subsequent purchaser is not a party to the original transaction and therefore would not encounter . . . 'disproportionate bargaining power.'" *Id.* ¶ 38 (noting plaintiff homeowners had no transaction with homebuilder), *vacated in part on other grounds*, 232 Ariz. 344, 306 P.3d 1 (2013). *Sullivan*, however, did not involve a third-party beneficiary of the transaction.

¶38 Because there is no published Arizona precedent involving a claim under the CFA by a third-party beneficiary, we examine the language of the statute. If the language is clear and unambiguous, we apply it without resorting to other methods of statutory interpretation. *Haag v. Steinle*, 227 Ariz. 212, ¶ 9, 255 P.3d 1016, 1018 (App. 2011). But if multiple plausible interpretations exist, we then consider the statute's context, language, subject matter and historical background and its effects, consequences, and spirit and purpose. *Id.*

¶39 We have noted that "[t]he terms of th[e] [CFA] are obviously quite broad and are not subject to restrictive interpretation because the Act is generally to be considered remedial in nature." *People ex rel. Babbitt v. Green Acres Trust*, 127 Ariz. 160, 164, 618 P.2d 1086, 1090 (App. 1980), *superseded by statute on other grounds*, 1981 Ariz. Sess. Laws, ch. 295, § 5, *as recognized in State ex rel. Corbin v. Pickrell*, 136 Ariz. 589, 667 P.2d 1304 (1983). We have further observed that, although not limitless, the CFA's definitions are "expansive," *Hambicki*, 183 Ariz. at 87, 900 P.2d at 1223, and that the CFA, while applying to "consumers" through its title, provides no definition of that term.[12] *See Flower World of Am., Inc. v. Wenzel*,

---

[12]Although § 44-1522 does not use the term "consumer," the section is within article 7, titled "Consumer Fraud," and the term has previously been read into the section by this court. *See Flower*

122 Ariz. 319, 321, 594 P.2d 1015, 1017 (App. 1978); *Sullivan*, 231 Ariz. 53, ¶ 38, 290 P.3d at 454 (subsequent purchaser not within "class of consumers" protected by implied private cause of action under CFA); *see also State v. Barnett*, 142 Ariz. 592, 597, 691 P.2d 683, 688 (1984) (statutory title may aid in interpreting statute).

¶40 Although Jones would have us limit a private CFA cause of action to the parties to the transaction involving the misrepresentation, the broad language of the act would appear only to require that a consumer have a relationship to the transaction. *See* § 44–1522(A) (statute pertains to misrepresentations or deceptive acts made "in connection with the sale or advertisement" of good or service). The CFA requires that a misrepresentation or deceptive act be made with intent that "others" rely on it, without specifying the relationship of those "others" to the transaction. *Id.* Further, the language "whether or not any person has in fact been misled, deceived or damaged thereby," suggests that third parties are not excluded. *Id.*

¶41 The Murrays cite cases from Washington, the District of Columbia Circuit, and Texas to support their argument that as a third-party beneficiary Jessyka should be afforded standing under Arizona's CFA. *See Escalante v. Sentry Ins. Co.*, 743 P.2d 832, 834, 839-40 (Wash. Ct. App. 1987) (vehicle passenger had standing under Washington's CFA because she was "an insured and a third party beneficiary [of the driver's UIM coverage] by virtue of the policy coverage for passengers"); *Athridge v. Aetna Cas. & Sur. Co.*, 351 F.3d 1166, 1176 (D.C. Cir. 2003) (child of insureds and "person potentially insured by" policy is a consumer under act "even if he was not the party who purchased the insurance"); *Mendoza v. Am. Nat. Ins. Co.*, 932 S.W.2d 605, 608-09 (Tex. App. 1996) (beneficiary of life insurance policy has standing under consumer fraud act). Although Jones points out that Washington's consumer fraud act is more broadly worded than Arizona's, *see* Wash. Rev. Code § 19.86.010(2) (act

---

*World of Am., Inc. v. Wenzel*, 122 Ariz. 319, 321, 594 P.2d 1015, 1017 (App. 1978); *Sullivan*, 231 Ariz. 53, ¶ 38, 290 P.3d at 454; *Hambicki*, 183 Ariz. at 88, 900 P.2d at 1224.

applies to "the sale of assets and services, and any commerce directly or indirectly affecting the people of the state of Washington"), he differentiates the D.C. Circuit and Texas cases because they expressly include as a "consumer" a recipient or beneficiary of a good or service. *See* D.C. Code § 28-3901 (2013) (defining "consumer" as person who "would purchase . . . or receive consumer goods or services"); *Bohls v. Oakes*, 75 S.W.3d 473, 479 (Tex. App. 2002) ("A third party beneficiary may qualify as a consumer of goods or services, as long as the transaction was specifically required by or intended to benefit the third party and the good or service was rendered to benefit the third party."). Because "consumers" are the named subject of the Act, and because the plain meaning of that term accords with viewing a consumer as a recipient of goods or services, *see* Merriam-Webster Online Dictionary, 2015, http://www.merriam-webster.com/dictionary/consumer (10 Dec. 2015), ("one that consumes" or that "utilizes economic goods"), we do not disregard the precedent cited by the Murrays.

¶42        The Murrays further point out, pursuant to Ariz. R. Sup. Ct. 111(c), (d), a recent unpublished decision by the Arizona Federal District Court denying an insurance company's motion to dismiss a life insurance beneficiary's CFA claim. In *Moreno v. Minn. Life Ins. Co.*, No. CV 14-2022-TUC-FRZ, 2015 WL 1457419, *6 (D. Ariz. Mar. 30, 2015), the court found that the plaintiff was "specifically intended . . . to receive the benefit of the transaction." The court stated:

> [n]o language in either the Consumer Fraud Act or the Unfair Insurance Practices Act suggest[s] that the beneficiary of a life insurance policy would not also have a cause of action in place of the insured under similar circumstances. Nor is there any "logical basis upon which to distinguish [the beneficiary] from the insured . . ." on the facts of this case. Plaintiff also points out that at the time the insurer is obligated to perform under a life

insurance policy, the insured has ceased to exist and, therefore, consumer fraud protection would be meaningless unless it extended to the third-party beneficiary. . . . In light of the broad remedial purposes of the Consumer Fraud Act, Plaintiff's argument is well taken in context of a life insurance policy. Significantly, both the insured and insurer specifically intended Plaintiff to receive the benefit of the transaction.

*Id.* at 7 (citations omitted), *quoting Gould v. Mutual Life Ins. Co. of N.Y.*, 683 P.2d 207, 208 (App. 1984) (first alteration added, second alteration in *Moreno*). Although the decision is neither published nor an appellate opinion, it is well-reasoned under its facts and has persuasive value. *See* Ariz. R. Sup. Ct. 111(c), (d).

**¶43** In view of the broad language and remedial purpose of the CFA, Jessyka's status as a third-party beneficiary to the transaction, and the persuasive reasoning of other courts that have addressed this or similar issues, we conclude she has standing to bring a claim under the statute. *See Athridge*, 351 F.3d at 1176 (third-party beneficiary could properly bring CFA claim). We therefore reverse the trial court's grant of summary judgment and remand this issue for further proceedings.

### Interpretation of Umbrella Policy

**¶44** The Murrays next argue the trial court erred when it ruled that their $1,000,000 umbrella policy[13] would have provided

---

[13]Umbrella coverage "'applies when the same insured has purchased underlying coverage for the same risk" and "provides, for a modest premium, coverage against catastrophic losses that exceed the limits of the underlying coverage.'" *Johnson v. Cont'l Ins. Co.*, 198 Ariz. 160, ¶ 13, 7 P.3d 966, 968 (App. 2000) (emphasis omitted), *quoting St. Paul Fire & Marine Ins. Co. v. Gilmore*, 168 Ariz. 159, 162, 812 P.2d 977, 980 (1991). Benefits under the policy are paid

$1,000,000 of combined UM/UIM coverage rather than $2,000,000 ($1,000,000 for each type of coverage), but for Jones's negligence. They point out that § 20-259.01(H) provides: "Uninsured and underinsured motorist coverages are separate and distinct and apply to different accident situations," and argue that the court's ruling that the "umbrella policy contained a combined $1,000,000 of UM and UIM coverage completely undercuts A.R.S. § 20-259.01(H)."

¶45 Jones responds that the $1,000,000 maximum combined UM/UIM benefit was clearly stated in the policy endorsement and lawful under the statute. He notes that had the Murrays purchased UM/UIM coverage on their umbrella policy, the terms would have been stated in policy endorsement Form E011 3d. ed.,[14] which provides in relevant part:

> For the additional premium paid, it is agreed that this policy will provide Uninsured and/or Underinsured Motorist Coverage(s) payable to you and any other insured under this policy, to the extent that either or both coverages are a part of the underlying insurance.
>
> The limit of liability for Uninsured/Underinsured Motorist Coverage is equal to the coverage limits shown in the Limits of Liability section of the policy Declarations Page. The Uninsured/Underinsured Motorist Coverage limit applicable in the event of an occurrence is not increased regardless of the number of covered autos, insureds, claims made or vehicles involved in the accident.

only after the primary coverage limits of the same insured have been exhausted. *Id.*

[14]As stipulated by the parties in their joint pretrial statement.

Jones maintains that under the endorsement, "the Murrays would have been limited to a single limit of $1,000,000, 'regardless of the number of autos . . . claims made or vehicles involved in the accident'" and consequently "[t]he policy limits are the same regardless of the number of claims made or the vehicles involved." This court reviews the interpretation of statutes and contracts de novo. *See Grosvenor Holdings, L.C. v. Figueroa*, 222 Ariz. 588, ¶¶ 9, 11, 218 P.3d 1045, 1050-51 (App. 2009).

¶46 Pursuant to § 20-259.01, when an insured purchases a primary automobile policy, the insurer must offer both UM and UIM motorist coverage in limits "not less than the liability limits for bodily injury," and the coverages "are separate and distinct and apply to different accident situations." As the Murrays note, courts have invalidated limit-of-liability provisions designed to reduce or eliminate UM/UIM coverage by setoffs or reductions when the insured has not been fully compensated.[15] The Murrays argue that the same standards apply to umbrella policies.

¶47 Our supreme court "h[as] long held that exceptions to coverage not permitted by the [UMA] are void." *Taylor v. Travelers Indem. Co. of Am.*, 198 Ariz. 310, 315, 9 P.3d 1049, 1054 (2000). The statute, however, expressly exempts insurers from offering UM or UIM coverage under an umbrella policy. *See* § 20-259.01(L). Subsection L specifies: "An insurer is not required to offer, provide or make available coverage conforming to this section [UM and UIM coverage] in connection with any . . . umbrella policy . . . ." Umbrella policies therefore are expressly excluded from the requirements of § 20-259.01 and the Murrays have not provided any authority indicating that principles derived from primary auto

---

[15]*See Cundiff v. State Farm Mut. Auto. Ins. Co.*, 217 Ariz. 358, ¶¶ 11, 15-16, 174 P.3d 270, 273-74 (2008); *Taylor v. Travelers Indem. Co. of Am.*, 198 Ariz. 310, ¶ 16, 9 P.3d 1049, 316 (2000); *Spain v. Valley Forge Ins. Co.*, 152 Ariz. 189, 193-94, 731 P.2d 84, 88-89 (1986); *Calvert v. Farmers Ins. Co. of Ariz.*, 144 Ariz. 291, 297, 697 P.2d 684, 690 (1985).

policy cases regarding UM/UIM setoffs or reductions apply equally to umbrella policies.

¶48      In their opening brief, the Murrays make a passing assertion that, even if permitted by statute, the umbrella policy endorsement did not include "an unambiguous offset provision," "expressly reducing the limits of one coverage by the amount paid under the second coverage." Only in their reply brief do they develop that argument, and at oral argument raised an additional one selectively focusing on wording in the endorsement that the umbrella policy would provide UM "and/or "UIM "coverage(s)."[16] They contend that "[v]iewing UM and UIM as separate coverages," the language of the endorsement providing "coverage limits are not increased 'regardless of the number of covered autos, insureds, claims made or vehicles involved'" is to "prevent duplication of a single coverage." This interpretation, however, is not readily supported by the plain language of the endorsement and context in which the selected words appear, *see Emp'rs Mut. Cas. Co. v. DGG & CAR, Inc.*, 218 Ariz. 262, ¶ 24, 183 P.3d 513, 518 (2008) (where contract provisions plain and unambiguous, they must be applied as written, and court will not expand language "or add something to the contract which the parties have not put there"). Nor is such an interpretation required by the statute, because, as noted above, Arizona insurers are not required to provide any UM or UIM coverage as part of an umbrella policy.

¶49      The Murrays further assert that, as insureds, they could collect the limits of separate UM/UIM coverages "[a]bsent a valid limiting provision," and contend that "Farmers' endorsement does not limit collection of the entire limits of different coverages." But they do not cite any authority requiring or inferring such a result and the cases they cite for an insured's recovery "under both

---

      [16]We generally do not address arguments made for the first time in a reply brief or at oral argument but, in our discretion, do so here. *See, e.g., State v. Shipman*, 208 Ariz. 474, n.2, 94 P.3d 1169, 1171 n.2 (App. 2004); *Mitchell v. Gamble*, 207 Ariz. 364, ¶ 16, 86 P.3d 944, 949 (App. 2004).

coverages" do not involve umbrella policies. *See Am. Family Mut. Ins. Co. v. Sharp*, 229 Ariz. 487, ¶ 17, 277 P.3d 192, 197 (2012); *GEICO Gen. Ins. Co. v. Tucker*, 71 F. Supp. 3d 985, 988 (D. Ariz. 2014). In view of the plain language of the umbrella policy endorsement and the dearth of support for the Murrays' position, we conclude the trial court correctly ruled that had the Murrays purchased UM/UIM coverage under their umbrella policy, they would have been limited to a combined total of $1,000,000 for both UM and UIM.

## Cross-Appeal

¶50 Jones argues on cross-appeal that the trial court erred by denying him summary judgment on all claims, based on his compliance with Arizona's UM/UIM Act, § 20–259.01. In his summary judgment motion, Jones pointed out that the Murrays had repeatedly declined to increase their UM/UIM limits to match their liability limits and did so on forms approved by the DOI, as required by § 20-259.01. He noted that the forms explained the purpose of the coverage and provided the insureds the option to purchase UM/UIM coverage up to their liability limits. He identified one such form, a 1998 form initialed by Marcia Murray, describing UM/UIM coverage, in part, as follows:

> It's your choice whether to buy uninsured motorist or underinsured motorist coverages. Uninsured motorist coverage pays for medical expenses, lost wages, and pain and suffering caused by an uninsured driver, a hit-and-run driver or a miss-and-run driver. Underinsured motorist coverage increases your coverage for medical expenses, lost wages, and pain and suffering caused by a driver who doesn't have enough insurance to pay for these damages.

Based on his compliance with § 20-259.01, Jones argued he had met his duty to the Murrays as a matter of law. The trial court denied Jones's motion, finding that the protection afforded to insurers

under § 20-259.01 does not insulate an agent "giving . . . bad advice." After the conclusion of the Murrays' case and again following the verdict, Jones moved for judgment as a matter of law on the same grounds, but both motions were denied.

**¶51** Although an order denying summary judgment is generally not appealable, to avoid piecemeal litigation we may consider the merits of the motion and direct entry of summary judgment in Jones's favor if he is "entitled to that as a matter of law and there are no genuine issues of material fact precluding it." *Bothell v. Two Point Acres, Inc.*, 192 Ariz. 313, ¶ 7, 965 P.2d 47, 50 (App. 1998); *see also State Farm Mut. Auto. Ins. Co. v. Peaton*, 168 Ariz. 184, 194, 812 P.2d 1002, 1012 (App. 1990). Further, Jones preserved the issue for appeal by reasserting it in a motion for judgment as a matter of law. *See John C. Lincoln Hosp. & Health Corp. v. Maricopa County*, 208 Ariz. 532, ¶ 19, 96 P.3d 530, 537 (App. 2004) (party seeking to preserve summary-judgment issue for appeal, "with a possible exception for a purely legal issue, must do so by reasserting it in a Rule 50 motion for judgment as a matter of law or other post-trial motion").

**¶52** The UMA requires insurers to offer UM and UIM coverage to their insureds and "creates a 'safe harbor' if the insured signs a [Department of Insurance (DOI)]-approved form rejecting UM or UIM coverage." *Wilks v. Manobianco*, 237 Ariz. 443, ¶ 7, 352 P.3d 912, 914 (2015). As to UM coverage, that act provides:

> Every insurer writing automobile liability or motor vehicle liability policies shall . . . make available to the named insured thereunder and by written notice offer the insured and at the request of the insured shall include within the policy uninsured motorist coverage which extends to and covers all persons insured under the policy, in limits not less than the liability limits for bodily injury or death contained within the policy. The selection of limits or rejection of coverage by a named insured or

applicant on a form approved by the [DOI]
director is valid for all insureds under the
policy.

§ 20–259.01(A).[17]  By providing that selection of limits or rejection of
coverage on a DOI-approved form shall be "valid for all insureds
under the policy," the legislature sought to eliminate fact-intensive
inquiries regarding whether the insurer had offered UM/UIM
coverage.  *Ballesteros v. Am. Standard Ins. Co. of Wis.*, 226 Ariz. 345,
¶ 20, 248 P.3d 193, 197 (2011).  Insureds are bound by the
DOI-approved form regardless of their subjective understanding of
the form.  *See id.* ¶¶ 14-17 (notice not required to be in Spanish).

**¶53**        In *Wilks*, our supreme court held that an insurance
company's compliance with the statute, by having its insured sign a
DOI-approved form, does not bar a claim against the insurance
agent for negligently failing to procure UIM coverage requested by
the insured.  237 Ariz. 443, ¶¶ 10-11, 352 P.3d at 915-16.  Jones
argues that *Wilks* is distinguishable from the case at hand, noting
that in that case, the plaintiff alleged the insurance agent failed to
procure the UIM insurance she requested, while here the Murrays
contend that Jones misled them as to the nature and importance of
the UM/UIM coverage.  He points out that the *Wilks* court
emphasized "[a]n agent's common law duty to its clients to procure
requested UIM coverage . . . remains distinct from the duties
prescribed in § 20-259.01," *id.* ¶ 11, and asserts "[u]nlike *Wilks*,
allowing [the Murrays] to pursue a common law negligence claim
against Jones runs directly contrary to the language and purpose of
A.R.S. § 20-259.01, which is intended to protect the insurer from
after-the-fact inquiries concerning whether UM/UIM coverage was
sufficiently offered by the insurer."  He further notes that in *Wilks*,
the insurance company was dismissed from the action and

---

[17] Section (B) imposes the same requirements for UIM
coverage.  *See* § 20–259.01(B).

consequently could not be held vicariously liable for the agent's alleged negligence, unlike in this case.[18]

**¶54** The *Wilks* court observed that "completing the DOI-approved form eliminates fact questions concerning 'whether UM/UIM coverage was sufficiently offered' by the insurer and 'whether the terms of the offer were understood.'" *Id.* ¶ 10, *quoting Ballesteros*, 226 Ariz. 345, ¶ 22, 248 P.3d at 198. Noting that the legislature had intended to "'protect insurers from after-the-fact inquiries regarding the offer of coverage'" the court stated that while the act bars inquiries related to the insurer's offer of UM and UIM coverage, "[f]actual inquiries related to other types of alleged negligence or wrongdoing are neither expressly nor implicitly barred." *Id.*, *quoting Ballesteros*, 226 Ariz. 345, ¶ 22, 248 P.3d at 198 (emphasis omitted). Here there is no dispute that the Murrays were offered UM and UIM coverage on a DOI-approved form, which they signed; the issue is whether they were affirmatively misled into signing it. The statute would work an inequity if the DOI-approved form could shield an agent from liability for having misled an insured to sign it, assuming arguendo that the statute applies to agents under the facts here. Because the issue is not whether the offer of UM and UIM insurance was made and sufficiently so, but it

---

[18]Jones concedes that "the *Wilks* Court . . . addressed the fact that A.R.S. § 20-259.01 does not mention 'agents' and, therefore, should not be interpreted to protect them to the same extent as the insurer," but asserts that because *Wilks* "did not rest its decision solely on the absence of the word 'agent' in the statute, in a case like the present one, the Court may extend protection to an agent who complies with the statutory requirement of obtaining the insured's signature on a DOI-approved UM/UIM selection form." He asserts, "[t]his is particularly true, when, as here, the plaintiff seeks to hold the insurance company vicariously liable for the agent's actions." Under the circumstances of this case, however, we find it unnecessary to address Jones's argument that compliance with § 20-259.01 could shield agents, and not only insurance companies, from liability.

whether Jones violated the applicable standard of care by providing the Murrays with misleading information about the coverage, which induced them to reject a higher level of UM and UIM coverage, we conclude the trial court did not err in denying Jones summary judgment on the Murrays claims based on § 20-259.01.

## Disposition

¶55      For the foregoing reasons, the trial court's rulings are affirmed except with respect to the Murrays' claims for emotional distress damages and statutory fraud, which rulings are reversed.