278 P.3d 333

**John POWERS, III, an unmarried man, Plaintiff/Appellee/Cross–Appellant,**

**v.**

**GUARANTY RV, INC., an Oregon corporation, Defendant/Appellant/Cross–Appellee.**

**No. 1 CA–CV 11–0062.**

Court of Appeals of Arizona, Division 1, Department E.

June 12, 2012.

Renaud Cook Rury Mesaros, P.A. By John A. Klecan, Erick S. Durlach, Kevin R. Myer, Phoenix, Attorneys for Defendant/Appellant/Cross–Appellee.

DePasquale & Schmidt, P.L.C. By Mark J. DePasquale, Phoenix, Attorneys for Plaintiff/Appellee/Cross–Appellant.

## OPINION

HALL, Judge.

¶ 1 Guaranty RV, Inc. (Guaranty) appeals from the trial court's judgment in favor of John Powers, III (Powers) on Powers' claim of consumer fraud. Powers cross-appeals from the trial court's judgment in favor of Guaranty on Powers' claim of fraudulent inducement. For the reasons discussed below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 In early January 2004, Powers attended a motor home show in Tucson where he and Damon Rapozo, a salesman for Guaranty, discussed Powers purchasing a Country Coach, Inc. (Country Coach) motor home from Guaranty. Powers had certain specifications that he wanted in a motor home, including an engine sufficiently powerful to tow a large trailer. On January 21, 2004, Rapozo sent Powers a proposal for a Country Coach Intrigue motor home with a C–13 Caterpillar 525 hp engine. Because Powers had heard of instances in which large engines in motor homes overheated, he specifically asked for an assurance that the C–13 engine would not overheat in the Intrigue. In response, Rapozo emailed Jeff Howe, an employee with Country Coach, the following:

Hi Jeff,

I have a customer ready to fly up and order a new Intrigue Serenade. He wants a letter from CC that states the C–13 will not overheat in the Intrigue, then he said he will fly up. Is that possible?

Damon

¶ 3 Howe forwarded Rapozo's email to Bently Buchanan, Country Coach's chassis engineering manager, who replied via email as follows:

The cooling system for each power train installation is required to be tested by the engine manufacturer. The cooling system consists of a radiator, charge air cooler, transmission cooler, hydraulic oil cooler, air conditioning condenser, hydraulic pump, hydraulic motor and the cooling fan. Recently we successfully completed this testing for our C–13 installation on our Magna and Affinity chassis. This same cooling system will be used on your Intrigue with the C–13. The only difference between our Magna/Affinity installation and the Intrigue is the engine access door. On our Magnas and Affinities the doors have "hidden horizontal louvers" cut into them. On Intrigues we install a door which has a perforated aluminum panel on it. These louvers and perforations aid in engine compartment heat dissipation. Whereas I have faith that our cooling package installation on the C–13 Intrigue will be successful, the effect that the different door has on cooling is unknown at this time. Because our cooling system equip-

ment is the same on all chassis with the C–13, we are not required to test our Intrigue installation.

¶ 4 Rapozo then transmitted Buchanan's response to Powers. On July 19, 2004, Powers and Guaranty executed the purchase documents for the 2004 Intrigue for a sales price of $344,382.00. The Intrigue overheated during its initial drive from the lot in Oregon to Arizona, and repeatedly thereafter. On July 18, 2005, Powers filed a complaint against Country Coach and Guaranty alleging breach of warranty (against Country Coach only), fraudulent inducement, consumer fraud, violation of the Oregon Lemon Law (against Country Coach only), and violation of the Magnuson–Moss Warranty Act (against Country Coach only).

¶ 5 On March 2, 2009, Country Coach filed notice that an involuntary Chapter 11 bankruptcy petition had been filed against it, staying its involvement in this action until further notice by the Bankruptcy Court. At the request of the parties, the matter was then presented to the court for a bench trial as to the claims of fraudulent inducement and consumer fraud against Guaranty.

¶ 6 The three primary issues presented for the trial court's determination were whether: (1) Guaranty is liable for using the Buchanan e-mail to induce Powers to purchase the motor home; (2) Guaranty is liable for oral assurances Rapozo provided to Powers that the overheating problems with the C–13 were fixed and the manufacturer had parameters in place to ensure that the motor home would not overheat; and (3) Guaranty is liable for Rapozo's failure to inform Powers that another Guaranty customer, David Hoffman, reported an overheating incident that occurred a few days before Powers finalized his purchase.

¶ 7 After a five-day trial, the court entered a detailed minute entry ruling in favor of Guaranty on all counts. The trial court found, in relevant part:

173. There is clear and convincing evidence that Guaranty provided the statement in writing from Buchanan to induce Powers to purchase the Coach from Guaranty. This writing was false and misleading in that it stated the testing was suc-

cessfully completed when the testing was not performed pursuant to the manufacturer's test protocol. There were also test objectives that remained "inconclusive" at the time Buchanan wrote the e-mail. In addition, the e[-]mail was misleading in that it did not inform Powers of the concerns the participants in the test had concerning the manner in which the test was conducted.

174. [W]hen Guaranty passed along the letter and information from Buchanan, it was not intending to separately make a representation.

. . . .

176. Guaranty, through its salesman, also provided certain oral assurances but they were honest as far as Guaranty knew. Guaranty was also aware, prior to the finalization of the sale of the Coach to Powers, that there was at least one event of the C–13 possibly overheating.

 a. July 30, 2004, is the first that Rapozo knew of Hoffman's problem, but he knew of the overheating claims earlier, just as 7/19/04, he just didn't realize that there was an overheating problem that wasn't being taken care of.

 b. This is because the engine started up again fine and drove well back to Oregon and [Country Coach] couldn't find a problem.

 c. Rapozo thought Hoffman was having an intermittent battery cable problem.

 d. Rapozo is sure that no one told him early on that there was a history of high temperatures or Silverleaf history.

177. Given Powers strong concerns he repeatedly expressed to Rapozo about the C–13 overheating, Rapozo on behalf of Guaranty was obligated to disclose the knowledge they had of the subsequent overheating. But by this time, Guaranty knew of Powers' overheating problems and they were working to try to fix it. Guaranty's failure to disclose all of the problems that other owners were having is *not* equivalent to a misrepresentation.

178. The evidence does *not* show that Powers materially relied upon the statements provided by Guaranty as these statements were a passing along of the information provided by [Country Coach]. If Rapozo had known about and informed Powers of the Hoffman C–13 *overheat* as opposed to the engine shutdown which Hoffman assumed was an overheat, Powers would not have completed the sale; however, Guaranty didn't know there was an overheating problem. The factory didn't conclude that there was an overheat when they checked out the Hoffman coach soon thereafter. The statements and omissions by Guaranty were thus not material and an inducing cause.

. . . .

183. Guaranty made no original representation about the reliability of the C–13 engine but instead passed along the statements of [Country Coach]. Nor was there any intent by Guaranty to hide the information it was learning. Instead, it was in the process of figuring out what the problems were with the C–13, but knowledge of overheating was not apparent until well after Powers had taken delivery on the Coach.

¶ 8 On January 4, 2010, Powers filed a motion for new trial raising two issues: (1) the trial court erred by concluding Guaranty was not liable under the Consumer Fraud Act (CFA) because liability extends to all who "use or employ" a false or misleading statement in connection with a sale of merchandise, even to those who did not "originate" the misrepresentation or intend to deceive, and (2) the trial court erred by finding Guaranty was not liable for Rapozo's failure to inform Powers of Hoffman's report of an overheat.[1]

¶ 9 After taking the matter under advisement, the trial court upheld its previous ruling that Guaranty is not liable for failing to notify Powers of Hoffman's "trouble with his motor home." The trial court reversed its ruling on the issue of consumer fraud, however, concluding that, under the CFA, a "per-

son is strictly liable for a misrepresentation involved in a sale, regardless of how innocent and in good faith the representation was." The trial court further concluded that "there is no defense in a suit filed by a purchaser for Guaranty having innocently and unknowingly pass[ed] along wrong, material information, even though the State could not impose a civil liability for the same action." On November 24, 2010, the trial court entered judgment in favor of Powers in the amount of $344,302.00 and ordered that Powers return the vehicle "upon payment of this Judgment."

¶ 10 Guaranty timely appealed and Powers timely cross-appealed. We have jurisdiction pursuant to Arizona Revised Statutes (A.R.S.) section 12–2101(B) (2003).

### ISSUES

¶ 11 In its appeal, Guaranty primarily raises two issues: (1) Did the trial court err by finding Guaranty liable under the CFA? (2) If Guaranty is liable under the CFA, did the trial court nonetheless err by failing to apportion fault between Guaranty and Country Coach? In his cross-appeal, Powers raises one issue: (1) Did the trial court err by finding that Guaranty was not liable for failing to disclose to Powers the reported Hoffman overheat? We address each issue in turn.

### DISCUSSION

**I. Liability Under the Consumer Fraud Statute**

¶ 12 Guaranty contends that the trial court erred by finding it liable under the CFA. First, Guaranty asserts the trial court erred by classifying the CFA as a strict-liability statute. Second, Guaranty argues that liability does not attach under the CFA unless the defendant had the "intent to do the act involved." Defining the requisite "act" in this case as "mak[ing] a representation," Guaranty maintains that its conduct, merely "passing along" an email rather than

---

1. In his motion for new trial, Powers did not challenge the trial court's finding that Guaranty was not liable for oral assurances Rapozo provided to Powers. Likewise, he has not challenged that ruling on appeal.

conveying an independent representation, "did not constitute an 'act' of any legal significance."

¶ 13 We review a trial court's grant of a motion for new trial for an abuse of discretion. *Harris v. Harris*, 195 Ariz. 559, 561, ¶ 6, 991 P.2d 262, 264 (App.1999). We will affirm the trial court's judgment "even though the [ ] court may have reached the right result for the wrong reason." *City of Phoenix v. Geyler*, 144 Ariz. 323, 330, 697 P.2d 1073, 1080 (1985).

¶ 14 We review de novo the interpretation of a statute. *Schwarz v. City of Glendale*, 190 Ariz. 508, 510, 950 P.2d 167, 169 (App. 1997). "When analyzing statutes, we apply fundamental principles of statutory construction, the cornerstone of which is the rule that the best and most reliable index of a statute's meaning is its language and, when the language is clear and unequivocal, it is determinative of the statute's construction." *Deer Valley Unified Sch. Dist. No. 97 v. Houser*, 214 Ariz. 293, 296, ¶ 8, 152 P.3d 490, 493 (2007). Further, we examine a statute's "individual provisions in the context of the entire statute to achieve a consistent interpretation." *Reeves v. Barlow*, 227 Ariz. 38, 41, ¶ 12, 251 P.3d 417, 420 (App.2011) (internal quotation omitted). "Indeed, if statutes relate to the same subject and are thus *in pari materia*, they should be construed together ... as though they constituted one law." *Id.* (internal quotation omitted). Finally, "[e]ach word, phrase, clause, and sentence [of a statute] must be given meaning so that no part will be void, inert, redundant, or trivial." *Deer Valley*, 214 Ariz. at 296, ¶ 8, 152 P.3d at 493.

¶ 15 As set forth in A.R.S. § 44–1522(A) (Supp.2011), the CFA provides:

> The act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or dam-

aged thereby, is declared to be an unlawful practice.

■ ¶ 16 In a recent opinion, *State of Arizona ex rel. Horne v. Autozone, Inc.*, 227 Ariz. 471, 478, ¶¶ 15–19, 258 P.3d 289, 296 (App.2011), *vacated on other grounds by State ex rel. Horne v. Autozone, Inc.*, 229 Ariz. 358, 275 P.3d 1278 (2012), we held that the CFA is not a strict-liability statute. Although A.R.S. § 44–1522 does not "incorporate an intent requirement, ... the described conduct refers to activities that by their very nature require voluntary conduct in the sense of action that is undertaken freely." *Id.* at 476, ¶ 11, 258 P.3d at 294. Thus, to prevail, a plaintiff must demonstrate that the defendant "voluntarily intended to do the acts performed[.]" *Id.* at 478, ¶ 19, 258 P.3d at 296. Therefore, the trial court erred by finding the CFA is a strict-liability statute.

■ ¶ 17 We reject Guaranty's further claim, however, that its conduct does not constitute an "act" within the meaning of A.R.S. § 44–1522(A). Under the broad language of the CFA, the "use" of any misrepresentation in connection with the sale of merchandise is proscribed as unlawful. It is well-settled that a person or entity need not intend to deceive to violate the statute. *State ex rel. Babbitt v. Goodyear Tire & Rubber Co.*, 128 Ariz. 483, 486, 626 P.2d 1115, 1118 (App.1981) (holding "[i]t is not necessary to show a specific intent to deceive" under the CFA). Indeed, "there is no requirement in the statute that the defendant have knowledge that the misrepresentations are false." *Cearley v. Wieser*, 151 Ariz. 293, 295, 727 P.2d 346, 348 (App.1986). Rather, to maintain a private cause of action under the act, a plaintiff need only prove "a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and the hearer's consequent and proximate injury." *Dunlap v. Jimmy GMC of Tucson, Inc.*, 136 Ariz. 338, 342, 666 P.2d 83, 87 (App.1983).

¶ 18 Here, Guaranty's sales associate provided Powers with the misrepresentation that the testing on the C–13 engine had been successfully completed. There is no dispute that Guaranty voluntarily transmitted the email to Powers, satisfying the requisite in-

tent to do the "act." Guaranty nonetheless argues that it is not liable under the CFA because it is not the original source of the misrepresentation, merely the messenger. We disagree.

■ ¶ 19 The CFA does not limit liability to the originator of a misrepresentation. Rather, it broadly extends liability to any person who "use[s]" the misrepresentation in connection with the sale of merchandise. In this case, Guaranty, through Rapozo, solicited the misrepresentation from Country Coach, albeit without knowledge of its falsehood, and then "use[d]" the misrepresentation to close the sale with Powers.

■ ¶ 20 Citing A.R.S. § 44–1523 (2003), which absolves media entities that publish or broadcast advertisements containing false information from liability, Guaranty nonetheless contends that it likewise acted as a conduit of information exempt from the CFA. This claim is also without merit.

¶ 21 Rather than supporting Guaranty's position, A.R.S. § 44–1523 demonstrates that the legislature, in enacting A.R.S. § 44–1522, contemplated that persons or entities may be liable for misrepresentations for which they are not the original source. Accordingly, the legislature decided to exempt media outlets that may transmit false statements, but have no financial interest in the actual sale of merchandise, from liability. In contrast, Guaranty's financial interest in the sale of the motor home to Powers was direct and thus its role in relating the misrepresentation to Powers is simply not analogous to that of a media outlet publishing a third-party's advertisement.

■ ¶ 22 Finally, Guaranty asserts that it is absolved from liability under the CFA because it disclaimed any representations in the purchase agreement. The Powers/Guaranty purchase agreement contained the following boiler-plate language:

6. I understand that employees of Guaranty RV, Inc. are not authorized to make any specific representations about the vehicle including, but not limited to, its condition, engine size, fuel mileage, payload capacity, towability, or otherwise, and any

such representations are opinions upon which I have no right to rely.

■ ¶ 23 "The [CFA] is designed to root out and eliminate unlawful practices in merchant-consumer transactions." *People ex rel. Babbitt v. Green Acres Trust,* 127 Ariz. 160, 164, 618 P.2d 1086, 1090 (App.1980), *superseded by statute on other grounds,* 1981 Ariz. Sess. Laws, ch. 295, § 5; *see also State ex rel. Woods v. Hameroff,* 180 Ariz. 380, 382, 884 P.2d 266, 268 (App.1994) (noting the CFA "is a broadly drafted remedial provision designed to eliminate unlawful practices in merchant-consumer transactions"). Given the broad remedial purpose of the CFA, we do not accept Guaranty's argument that, notwithstanding its direct merchant-consumer relationship with Powers, it may contractually disclaim all liability under the CFA for misrepresentations it conveyed to Powers. *Compare Castle v. Barrett–Jackson Auction Co., LLC,* 229 Ariz. 471, 276 P.3d 540 (App. 2012) (holding that a car auctioneer was not liable for the representations a car owner made about its merchandise). Allowing boiler-plate disclaimers of this nature to absolve all liability would render the protections afforded by the CFA a nullity. Therefore, we affirm the trial court's ruling that Guaranty is liable under the CFA for consumer fraud. *See State v. Sgrillo,* 176 Ariz. 148, 149, 859 P.2d 771, 772 (App.1993) ("The broadly remedial purposes of the CFA should not be defeated by niggling distinctions unrelated to the protection of consumers by the elimination of fraud.").

## II. Application of Comparative Fault

■ ¶ 24 Guaranty next argues that the trial court erred by failing to apportion fault between Guaranty and Country Coach pursuant to the comparative fault statute, A.R.S. § 12–2506 (2003). Guaranty did not raise this issue, however, until it filed its motion to reconsider after the trial court had granted Powers' motion for new trial. "We review a trial court's denial of a motion for reconsideration for an abuse of discretion." *Tilley v. Delci,* 220 Ariz. 233, 238, ¶ 16, 204 P.3d 1082, 1087 (App.2009). "Generally, we do not consider arguments raised for the first time in a motion for reconsideration."

*Ramsey v. Yavapai Family Advocacy Ctr.,* 225 Ariz. 132, 137, ¶ 18, 235 P.3d 285, 290 (App.2010). We conclude the trial court did not abuse its discretion in declining to address this issue, and we likewise decline to do so here. We also decline to address Powers' "cross-issue" that the remedy adopted by the trial court is in the nature of a rescission, not damages, and therefore the comparative fault statute does not apply.

## III. Duty to Disclose

 ¶ 25 In his cross-appeal regarding his common-law fraud claim, Powers contends that the trial court erred by finding Guaranty did not have a duty to disclose the Hoffman report of overheating to Powers. Specifically, Powers argues that the trial court erred by focusing on Rapozo's belief that Hoffman's motor home "troubles" were actually the result of an intermittent battery cable problem, not an overheat, rather than contemplating the importance a reported overheat would have had to Powers.

¶ 26 We defer to a trial court's findings of fact unless they are clearly erroneous, but review conclusions of law de novo. *Flying Diamond Airpark, L.L.C. v. Meienberg,* 215 Ariz. 44, 47, ¶ 9, 156 P.3d 1149, 1152 (App. 2007). We view the evidence and all reasonable inferences in the light most favorable to sustaining the trial court's ruling. *Inch v. McPherson,* 176 Ariz. 132, 136, 859 P.2d 755, 759 (App.1992).

 ¶ 27 "Fraud will not be presumed and must be proved by clear and convincing evidence." *Universal Inv. Co. v. Sahara Motor Inn, Inc.,* 127 Ariz. 213, 214, 619 P.2d 485, 486 (App.1980). "Concealing a material fact when there is a duty to disclose may be actionable fraud." *Id.* Generally, a seller does not have a duty to disclose, but certain circumstances may give rise to such a duty. *Id.* at 215, 619 P.2d at 487. When a buyer inquires about a certain condition, a seller has the duty to disclose all he knows. *Id.*

¶ 28 "A person's non-disclosure of a fact known to him is equivalent to an assertion that the fact does not exist [ ] where he knows that disclosure of the fact is necessary to prevent some previous assertion from being a misrepresentation or from being fraudulent or material." Restatement (Second) of Contracts (Restatement) § 161. As explained in comment c to Restatement § 161, a seller "is expected to speak up and correct [an] earlier assertion" when he acquires "knowledge" that "bears significantly on his earlier assertion."

¶ 29 The trial court found that Guaranty was "aware, prior to the finalization of the sale of the Coach to Powers, that there was at least one event of the C–13 *possibly* overheating." (Emphasis added). The trial court further found, however, that Guaranty, through Rapozo, did not *know* there was an overheating problem with the C–13 engine on July 19, 2004 (the date Powers completed his purchase) because the one reported overheating incident (Hoffman) did not present as a customary overheat. Instead, Hoffman was able to restart his engine shortly after the engine degraded and was able to proceed on his trip without further incident. As a result, Rapozo believed Hoffman's motor home had an "intermittent battery cable problem," not an overheating problem as Hoffman had initially reported.

¶ 30 The trial court ultimately found that Guaranty did not *know* there was an overheating problem, and therefore was not liable for fraud. The record supports the trial court's finding.

¶ 31 As explained in Restatement § 161, a seller is liable for failing to correct a previous assertion when he acquires "knowledge" that the previous statement is false. Powers contends that the additional knowledge requiring Guaranty to disclose here was Hoffman's report of an overheat. As did the trial court, we conclude that Hoffman's mere report of an overheat did not trigger a duty to disclose. Relying on his knowledge, as well as the reported experiences of other customers, Rapozo concluded that the incident Hoffman described was inconsistent with an overheat and was more likely a battery cable problem. Thus, no additional "fact" was brought to Rapozo's attention that bore "significantly" on, and was contrary to, an earlier representation and he therefore was not required to disclose the reported overheat to Powers.

**CONCLUSION**

¶ 32 For the foregoing reasons, we affirm. Powers has requested an award of attorneys' fees on his cross-appeal pursuant to A.R.S. § 12–341.01 (2003). Powers was not a "successful party" on his cross-appeal, and we deny his request.

CONCURRING: PATRICIA A. OROZCO, Presiding Judge, and JOHN C. GEMMILL, Judge.