NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

JEFFREY T., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, A.T., *Appellees*.

No. 1 CA-JV 18-0463
FILED 5-9-2019

Appeal from the Superior Court in Maricopa County
No. JD531555
The Honorable Karen L. O'Connor, Judge

**VACATED**

COUNSEL

Law Office of H. Clark Jones, LLC, Mesa
By H. Clark Jones
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Lauren J. Lowe
*Counsel for Appellee Department of Child Safety*

**MEMORANDUM DECISION**

Presiding Judge Lawrence F. Winthrop delivered the decision of the Court, in which Judge Maria Elena Cruz and Judge Kenton D. Jones joined.

**W I N T H R O P**, Judge:

¶1          Jeffrey T. ("Father") appeals the juvenile court's order adjudicating A.T. dependent as to him on the grounds of abuse and/or neglect. Concluding the court's findings are not reasonably supported by the record, we vacate the order.[1]

## FACTS AND PROCEDURAL HISTORY[2]

¶2          Father and Paula A. ("Mother") are the biological parents of A.T., born in May 2001.[3] Until she was twelve years old, A.T. lived primarily with Mother, and Father eventually gained parenting time under a "graduated visitation plan."

¶3          In June 2013, Father sought and was granted physical custody of A.T. on an emergency basis because Mother was selling prescription drugs out of her apartment and due to allegations of unsafe living conditions and Mother having unresolved substance abuse and mental health issues. In March 2014, the family court awarded Father sole legal decision-making authority and ordered that Mother undergo random drug testing and be permitted supervised parenting time only.[4] Subsequently, Mother was noncompliant with drug testing and failed to maintain any further contact with A.T.

---

[1]     We do not remand this matter for further proceedings because, by the time this decision is filed, A.T. will have turned eighteen years of age, and the juvenile court will no longer have authority over her. *See Maricopa Cty. Juv. Action No. JD-6236*, 178 Ariz. 449, 451 (App. 1994). A.T.'s age does not render this appeal moot, however, given the potential effect of the juvenile court's order on Father's interests. *See, e.g.*, Ariz. Rev. Stat. ("A.R.S.") § 8-804(A).

[2]     In reviewing an adjudication of dependency, we view the evidence in the light most favorable to affirming the juvenile court's findings. *Willie G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 231, 235, ¶ 21 (App. 2005).

[3]     Mother is not a party to this appeal.

[4]     By this time, however, A.T. was so angry with Mother, who she described as "emotionally abusive," that she refused to even sit in the same room with her.

¶4        Meanwhile, from 2013 to 2014, A.T. participated in counseling to address the trauma she experienced while living with Mother and, ostensibly, to address a diagnosed eating disorder, bulimia, which caused A.T. to binge and purge.  The therapy sessions ended after approximately one year when the therapist discharged A.T. because she "was doing well." Also, to address A.T.'s eating disorder, Father prepared home-cooked meals and taught her to cook, to utilize portion control, and to maintain healthy eating habits.

¶5        In the summer of 2016, A.T. ran away from her home in Tempe.  In July 2016, she contacted the Tempe Police Department, asked if Father had reported her as a runaway, and claimed Father had been mentally and physically abusing her.  Finding no evidence of abuse, the police contacted Father, who took A.T. to a mental health facility; however, A.T. refused to participate in mental-health services and was released soon afterward.

¶6        In August 2017, Father's long-time girlfriend, J.H., and her teenage son, Z.S., moved in with Father and A.T.  At approximately that same time, A.T.—who was by then sixteen years old—began dating a young adult male[5] who lived in Peoria, and that relationship caused significant tension between A.T. and Father.  A.T. began missing curfew and initially lied about the relationship, and when Father learned of it, he insisted the couple be accompanied by a "chaperone" if they continued to date.  Instead of acceding to Father's demands, however, the young couple continued to surreptitiously see one another, while engaging in sexual activity.

¶7        Throughout the fall of 2017, A.T. went into a "downward spiral" in which her lying became habitual, her "mood just kept getting worse," she became extremely aggressive, defiant, and hostile, and her eating disorder symptoms of binging and purging reappeared. Meanwhile, Father had recently obtained a Ph.D. in research psychology and had left his full-time work position to do an internship and obtain his clinical licensure so he could become a licensed psychologist. Due to these changes in his employment situation, Father no longer had insurance to cover A.T.'s mental health needs, and although he explored getting a therapist for A.T. either through a colleague or through the state's AHCCCS program, he did not procure one.

---

[5]        A.T.'s boyfriend was at least eighteen years old at the time the couple began dating.

¶8          On December 30, 2017, A.T. again ran away from home.  She later explained she was "scared to go home" and was "anxious, depressed, and suicidal."   Police officers located her at her boyfriend's house and returned her to Father's home, but she ran away again on January 3, 2018, leaving a note that stated she was moving in with her boyfriend and would return later for her belongings.  She returned home shortly thereafter.

¶9          On January 5, 2018, A.T. reported to the Department of Child Safety ("DCS") and the Tempe Police Department that Father had assaulted her.  When police officers arrived, A.T. described a January 2 incident in which Father had slapped her face after she became aggressive and began screaming profanities at him, but she had no visible injuries from the alleged assault.[6]  A.T. had some apparently minor bruising on her lower legs, forearm, and shoulder, however, which she stated was the result of her "wrestling" with Father when he attempted to confiscate a prohibited cell phone in her bag.[7]  She told the police that Father was verbally abusive and "controlling," she felt "stressed" and did not like to stay at home, and she wanted to strangle herself—although she immediately recanted and said she would "never do it."  When questioned at the home, Father's girlfriend, J.H., denied witnessing any physical violence and explained that A.T. was angry because she did not want to follow Father's rules.  When contacted later, Father denied abusing A.T. and explained she was "lashing out" due to restrictions on seeing her boyfriend.  Father also requested assistance in the form of counseling services at that time.  No charges were filed based on the reported incident.

¶10         Although DCS offered Father in-home family-preservation services, it did not immediately provide them.  Moreover, A.T. ran away again on January 19, further delaying services because DCS had a policy that it would not provide such services when the child was absent from the home.  A.T. finally returned home on February 4, and on February 14, the DCS in-home case manager referred the family for family-preservation services because of "the fragile home situation."  In her referral, the case

---

[6]     At the dependency hearing, Father testified he believed slapping A.T. was an appropriate form of discipline because he slapped her with an open palm to diffuse the situation, discipline her, and assert parental authority, and he did not injure or intend to injure her.

[7]     Father had limited, and eventually prohibited, A.T.'s cell phone use because she was using the phone to secretly arrange meetings with her boyfriend.

manager noted that "Father appears overwhelmed with [A.T.'s] behaviors and does not know how to fully parent her."

¶11　　　　The family-preservation team first met with Father on February 19, and services began in late-February 2018.  At the outset, A.T. refused to participate in sessions with Father, and on multiple visits in March, Father did not participate and went to his bedroom instead.  During these visits, Father and A.T.  either would not speak to each other or would have "escalated conversations involving profanities."  A.T. reported—and the DCS in-home case manager and family-preservation team effectively agreed—there was inadequate food in the home.[8]　The case manager characterized Father's progress in the briefly offered family-preservation services as "very minimal," noting he seemed to believe the services were more for A.T. than for him and that he was not receptive to the family-preservation team's concerns.

¶12　　　　Meanwhile, the relationship between A.T. and the other household residents, including Father, continued to deteriorate, as A.T. became increasingly violent and apparently launched a campaign of achieving the same end as she had sought through her failed runaway attempts.  In that regard, A.T. would consistently torment others in the household, challenging them to hit her and "leave marks" and intentionally running her shoulder into J.H. as she passed by her.  A.T. physically attacked J.H. on numerous occasions, throwing items from a closet at J.H., ripping J.H.'s hair from her head, and hitting J.H., but Father would not call the police out of fear A.T. would lie about the incident.

¶13　　　　On March 19, 2018, A.T. notified the DCS case manager that, several days earlier, she had sustained red "friction" marks on her neck while being restrained by J.H. and that Father had slapped her face and

─────────────

[8]　　　The in-home case manager testified that, on the sole occasion when she inspected the home, she observed a bag of frozen chicken, frozen vegetables, soup, and ramen noodles, but characterized the food as "not appropriate" for a sixteen-year-old child.  Father disagreed with this assessment, noting that although the food supply might occasionally be a little low, A.T. had "unlimited access" to healthy food, and he tried to limit the available "junk food" based on A.T.'s penchant for binging and purging when offered foods such as cookies or pie.  J.H., who worked at a restaurant and was able to bring "a lot of food" home, testified A.T. generally ate the same food as the rest of the family.  There is nothing in the record to suggest that A.T. was ever found to be malnourished.

grabbed her by the neck while pushing her against a wall. The case manager contacted the Tempe Police Department, which investigated the incident, interviewing each member of the household. The report indicates as follows: At approximately midnight on March 15, A.T. was secretly recording a conversation between Father and J.H., when J.H. became aware of it and confronted A.T.[9] J.H. picked up Father's laptop, which A.T. had been using, and it fell from J.H.'s hands. A.T. forcefully pushed J.H., and Father intervened, using his open palm to slap A.T. once on her left cheek.[10] A.T. grabbed her satchel and attempted to leave the home, but J.H. grabbed the satchel to try to stop her from leaving. A.T. then attacked J.H., pushing her backward and pulling her hair, and the two wrestled on the ground before Z.S. stopped the altercation. Z.S. advised the police that, before they arrived, A.T. had asked him to lie for her and claim she had been assaulted by Father and J.H. No charges were filed based on the reported incident.

¶14        On March 21, 2018, Father and A.T. engaged in another altercation, which began when J.H. allegedly caught A.T. using a cell phone to secretly record Z.S. while he was sleeping in his bedroom. J.H. told A.T. to stop, but she refused, and J.H. demanded A.T. give her the phone because A.T. was prohibited from having it. A.T. then attempted to leave the home, but J.H. blocked the front door, and A.T. attacked J.H., charging at her "really fast and hit[ting her] shoulder." Father restrained A.T., who was kicking and biting at him, while J.H. took the cell phone out of A.T.'s bag. Father then broke the cell phone by bending it in half. A.T. then left and went to school, and both A.T. and J.H. separately called the police soon afterward. Police observed multiple bruises and scratches on A.T.'s arms and several small cuts on her fingers. They also observed bruising on J.H.'s left shin, where A.T. had kicked her. Both J.H. and Father reported that they believed A.T. had mental health problems, but they had not taken her to a doctor or counselor due to a lack of health insurance. Again, no charges were filed based on the reported incident.

---

[9]        The record indicates A.T. on several occasions covertly recorded family members, apparently with the knowledge and approval of the DCS in-home case manager.

[10]        Father denied intervening during this incident, although he acknowledged slapping A.T. with an open palm during an incident around this time frame. He also denied pushing A.T. or putting his hands around her neck as she claimed.

¶15        That same day, DCS took A.T. into temporary custody, placed her in a group home, and filed a dependency petition, alleging she was dependent as to Father based on "abuse and/or neglect."  DCS's initial March 26 report to the court noted Father had told the case manager several times he thought A.T. was suicidal, experienced "psychotic episodes," and demonstrated "aggressive behavior."  The report further noted the case manager had urged Father to contact the crisis hotline or take A.T. to a behavioral-health hospital for evaluation, but Father had done neither.[11]

¶16        DCS offered supervised visitation, but both Father and A.T. initially refused to participate.  DCS also asked Father to participate in Child and Family Team meetings, and he initially did so, but A.T. subsequently requested he no longer participate in them.[12]  DCS reported it would offer family therapy to Father and A.T. when it was recommended by A.T.'s individual therapist.

¶17        On May 5, 2018, however, A.T. ran away from the group home.  Father eventually located her in August 2018,[13] notified DCS that A.T. had been taking photos of herself and her boyfriend "in their underwear,"[14] and told DCS he believed A.T. should be placed in a locked

---

[11]    The DCS report also noted A.T. had reported her glasses had been broken during the family's altercation, but Father refused to return them to her until she apologized, and A.T. had asked Father to schedule a dental appointment for her, but he had refused, citing a lack of insurance coverage.

[12]    A.T. also continued to refuse any contact with Mother, who was still refusing drug testing.

[13]    A.T. had been communicating by text with her maternal aunt in New York, who was assisting A.T. in remaining a runaway.  Despite this knowledge, DCS had been seeking—at the time of the dependency hearing—to have the maternal aunt approved as A.T.'s guardian but had not yet timely completed an approved ICPC form; accordingly, because A.T. was to turn eighteen years old in May 2019, DCS was also seeking an independent living case plan for her.

[14]    The ongoing case manager testified she found these photographs of A.T., who was still a minor, and her adult boyfriend "not concerning."  She further testified DCS was "okay" with A.T. having a cell phone, did not bother to check the phone, and was unconcerned about her using the cell phone to contact her boyfriend.

in-patient behavioral-health facility due to her behaviors and proclivity for running away. Although DCS considered utilizing such a placement, the only available placement at the time was a foster home, and A.T. was placed there.[15]

¶18        On November 5, 2018, the juvenile court held the dependency hearing. DCS's in-home case manager testified she believed Father had used inappropriate disciplinary techniques and neglected A.T.'s needs, and DCS had concerns over A.T.'s health and safety because it did not appear Father had been actively trying to obtain necessary behavioral-health or dental services. Father admitted that by January 2018, A.T.'s escalation of behaviors was "over [his] head," and acknowledged he had not obtained behavioral-health services, but stated he told the case manager on at least three occasions that he could not control A.T.'s behavior and needed help, which was not immediately forthcoming. A.T. did not testify; instead, she wrote a letter to the court in which she characterized her relationship with Father as "utterly toxic."

¶19        After hearing the testimony, the juvenile court took the matter under advisement, and on November 13, 2018, issued an order adjudicating A.T. dependent as to Father based on "abuse and/or neglect." We have jurisdiction over Father's timely appeal pursuant to A.R.S. §§ 8-235, 12-120.21(A)(1), and 12-2101(A)(1).

**ANALYSIS**

¶20        Father argues the juvenile court erred in finding him "unable to parent due to abuse and/or neglect," and in therefore adjudicating A.T. dependent as to him. Father maintains insufficient evidence supports the court's findings.

¶21        The burden of proof in a dependency hearing is by a preponderance of the evidence. *Cochise Cty. Juv. Action No. 5666-J*, 133 Ariz. 157, 159 (1982). The court's primary consideration in a dependency proceeding is the best interests of the child. *Michael M. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 230, 234, ¶ 17 (App. 2007). Consequently, the juvenile court is vested with "a great deal of discretion." *5666-J*, 133 Ariz. at 160. Further, because the juvenile court is "in the best position to weigh the evidence, judge the credibility of the parties, observe the parties, and make

---

[15]        In September 2018, DCS reported to the juvenile court that A.T. had shown no signs of aggression or extreme behaviors that would be detrimental to the safety of her or her foster family while in the foster home.

appropriate factual findings," *Pima Cty. Dependency Action No. 93511*, 154 Ariz. 543, 546 (App. 1987), we will not reweigh the evidence, *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 12 (App. 2002), and will affirm the court's adjudication unless no reasonable evidence supports it, *Willie G.*, 211 Ariz. at 235, ¶ 21; *Maricopa Cty. Juv. Action No. JD-6123*, 191 Ariz. 384, 392 (App. 1997). We review the juvenile court's dependency order for an abuse of discretion. *See 93511*, 154 Ariz. at 546.

**¶22** Under A.R.S. § 8-201(15)(a)(iii), a "[d]ependent child" is one "whose home is unfit by reason of abuse [or] neglect . . . by a parent . . . having custody or care of the child." As relevant to DCS's allegations and the court's findings in this case, "'[a]buse' means the infliction or allowing of physical injury," A.R.S. § 8-201(2), and "[n]eglect" means "[t]he inability or unwillingness of a parent . . . to provide [his] child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare," A.R.S. § 8-201(25)(a).

**¶23** The juvenile court found Father "unable to parent due to abuse and/or neglect." Father challenges these findings, arguing the evidence does not support the court's reliance on subsection (iii) of A.R.S. § 8-201(15)(a). In support of its finding of abuse, the juvenile court made only one finding:

> *Re: abuse*
> Father admitted to slapping the child twice and further believes slapping the child is an appropriate form of discipline.

**¶24** The juvenile court's finding, although factually correct, is by itself insufficient to find abuse. Under A.R.S. § 13-403(1), "[a] parent . . . entrusted with the care and supervision of a minor . . . may use reasonable and appropriate physical force upon the minor . . . when and to the extent reasonably necessary and appropriate to maintain discipline." In such cases, the use of physical force upon the minor, even though it might otherwise constitute an offense, "is justifiable and not criminal." A.R.S. § 13-403.

**¶25** In this case, at the dependency hearing, Father acknowledged slapping A.T. on two occasions, but testified he believed doing so was an appropriate form of discipline because he slapped her with an open palm to diffuse a volatile situation, discipline her, and assert parental authority, and he did not injure or intend to injure her. *See* A.R.S. § 13-403(1). Nothing

in the record contradicts Father's testimony, and in each case, as with other incidents involving A.T., no charges were filed based on the reported incident. Moreover, the record is replete with evidence that Father's physical actions toward A.T. were in response to her escalating verbal and physical attacks—and generally constituted either self-defense or defense of other family members. *See* A.R.S. §§ 13-404(A), -406; *see also* A.R.S. § 13-413 ("No person . . . shall be subject to civil liability for engaging in conduct otherwise justified pursuant to [a justification defense]."). Given the record before us, the juvenile court's finding, absent more, is insufficient to support a finding of abuse.

¶26        Additionally, in support of its finding that Father was unable to parent A.T. due to neglect, the juvenile court made the following findings:

> *Re: insufficient food*
> DCS and [the family-preservation team] determined there was insufficient food in the home for the child. Father disagrees. However, Father admits to monitoring the child's food intake. Father further believes monitoring the child's food intake is appropriate, even though there is no current medical professional recommending that he do so.

> *Re: other*
> For the past year Father has not provided the child with medical/dental/behavioral health insurance; he has not provided the child with dental care; he has not provided the child with counseling; he has not replaced the child's eye glasses.

¶27        In making its finding regarding food, the juvenile court relied on the lack of a current medical professional's recommendation that Father monitor A.T.'s food intake. However, the record is clear that A.T. has a history of bulimia, and both Father and J.H. provided uncontradicted testimony that A.T.'s eating disorder symptoms of binging and purging had recurred and required monitoring. Further, Father's uncontradicted testimony indicated that, to address A.T.'s eating disorder, Father generally prepared home-cooked meals, and had taught A.T. how to cook for herself, to utilize portion control, and to maintain healthy eating habits. Father also testified that A.T. had unlimited access to healthy food, explaining there was always food in the home that A.T. could—and did—prepare and eat in "a cabinet and an area of the refrigerator and an area of the pantry, and then the entire freezer. If [A.T.] felt that she wanted to eat any of those things,

then -- that were in there, then she could eat whatever she wanted in there, and anything else she would have to ask permission." J.H. provided uncontradicted testimony that A.T. generally ate the same food as the rest of the family, and, importantly, as noted, nothing in the record even remotely suggests A.T. was ever found to be malnourished.

¶28 The testimony of the DCS in-home case manager makes clear that DCS (and A.T.) took issue not so much with the amount of food available but with the types of food available to A.T., inexplicably characterizing the accessible healthy foods and limitations on "junk food" as "not appropriate" for a sixteen-year-old child. Given A.T.'s long-term eating disorder, however, and the lack of any indication that her bulimia issues had been fully resolved, as well as the lack of any indication that A.T.'s diet negatively affected her health, the finding of the court that Father neglected A.T. by monitoring the types of food she consumed cannot on this record be upheld.

¶29 The juvenile court also found that Father had neglected A.T. by failing to carry dental insurance, and as a result, had not provided her with the appropriate dental care. DCS's initial March 26, 2018 report to the court noted that, shortly before she was taken into DCS's custody, A.T. had asked Father to schedule a dental appointment for her, but he had refused, apparently citing a lack of insurance coverage. Father acknowledged in his testimony that he ultimately learned A.T. did have a cavity, but other than that and a brief rebuttal argument by counsel—which is not evidence—DCS presented no evidence of the severity of A.T.'s dental issues. Absent more, Father's brief hesitation in obtaining dental care does not support a finding of neglect.

¶30 The juvenile court also found that Father had neglected A.T. by failing to carry medical insurance, and cited Father's failure to replace the glasses she reportedly broke during an altercation with family members. As Father testified, however, A.T. "broke her own glasses" just before she was placed in DCS's custody, and he acknowledged refusing to repair or replace them until she apologized. On this record, neither Father's failure to repair or replace A.T.'s glasses in such a brief time frame nor Father's request for an apology support a finding of neglect.

¶31 The court also found that Father had neglected A.T. by failing to obtain counseling for her due to his lack of behavioral-health insurance. However, when Father still had insurance coverage in 2016, A.T. refused to participate in mental-health services, and nothing in the record even remotely indicates that she later became more receptive to such services.

Further, when A.T.'s negative behaviors began to escalate in the fall of 2017, Father attempted but failed to get help from a colleague and coverage through AHCCCS. Then, as Father testified, in January 2018, he told the in-home case manager at least three times that he could not control A.T.'s behavior:

> . . . I realized [A.T.'s] escalation of behaviors is [sic] over my head. So her behavior became so poor by January, that's when I realized, as a person, I couldn't deal with it, I wasn't enough. That's when I realized that there was nothing I could do. That's when I felt helpless because anything I told her, it was this, in one ear, out the other. That's when I basically said look, I need help. And I told [the in-home case manager] on three different occasions that I could not control [A.T.'s] behavior, on three different occasions. I told . . . her that.

¶32        Although DCS blames Father for his alleged recalcitrance in obtaining behavioral-health services, the record is clear that Father requested counseling services for A.T. by no later than January 5, 2018, but the family did not immediately receive those or other services. Instead, DCS waited until late February to begin providing in-home family-preservation services. It then withdrew those services a few weeks later, when DCS took A.T. into its custody. On this record, we cannot say that reasonable evidence supports the juvenile court's finding of neglect based on Father's failure to obtain behavioral-health insurance and counseling for A.T.

¶33        Finally, DCS argues the record is replete with evidence of Father's inability to effectively parent A.T. and control her behavior, including the fact that she ran away three times within the course of one month—with the last occasion resulting in her being out of the home for slightly more than two weeks.[16] We do not disagree with DCS that, had the juvenile court been presented with this argument, it might have adjudicated A.T. dependent based on subsection (i) of A.R.S. § 8-201(15)(a), which defines a dependent child as one who is adjudicated to be "[i]n need of proper and effective parental care and control and who has . . . no parent . . . willing to exercise or capable of exercising such care and control." *See also Maricopa Cty. Juv. Action No. J-75482*, 111 Ariz. 588, 590-91 (1975) ("If a

---

16        Of course, DCS fared no better in its efforts, as illustrated by the fact that A.T. ran away from the group home for more than *three months*—from early May until mid-August 2018—and DCS relied on Father to finally locate her.

child is found to be without [effective and proper] parental care and control and without parents willing or capable of exercising such care and control, the child is a dependent child entitled to have such care and control furnished through the state."). However, DCS did not raise subsection (i) as a basis for adjudicating A.T. dependent as to Father in its dependency petition, and the juvenile court did not rely on or make findings consistent with subsection (i) in its order.[17] Moreover, we note without deciding that, on this record, A.T. might have been better classified as an incorrigible child rather than a dependent child. *See* A.R.S. § 8-201(19)(a), (c), (d).

**CONCLUSION**

**¶34** The juvenile court's order adjudicating A.T. dependent as to Father on the basis of abuse and/or neglect is vacated.



AMY M. WOOD • Clerk of the Court
FILED: AA

---

[17] Although we may affirm a court's ruling if it reached the right result for any reason, *see, e.g.*, *Angela B. v. Ariz. Dep't of Child Safety*, 1 CA-JV 15-0104, 2015 WL 5043080, at *5, ¶ 24 (Ariz. App. Aug. 25, 2015) (mem. decision) (citing *Powers v. Guaranty RV, Inc.*, 229 Ariz. 555, 560, ¶ 13 (App. 2012)), we generally will not do so where the basis was not clearly raised or addressed by the court below. *See Louis C. v. Dep't of Child Safety*, 237 Ariz. 484, 489, ¶ 20 (App. 2015) (recognizing that this court generally does not consider issues raised for the first time on appeal (citation omitted)).